**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Pavel Ivanovich LAZARENKO,**
**Pavlo Ivanovych Lazarenko,**
**Defendant–Appellant.**

No. 06–10592.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted June 9, 2008.

Filed Sept. 26, 2008.

Dennis P. Riordan (argued), Donald M. Horgan, Riordan & Horgan, Doron Weinberg, Weinberg & Wilder, San Francisco, CA, for the defendant-appellant.

Hartley M.K. West (argued), Assistant United States Attorney; Scott N. Schools, United States Attorney; Barbara J. Valliere, Chief, Appellate Section, San Francisco, CA, for the plaintiff-appellee.

Before: A. WALLACE TASHIMA, M. MARGARET McKEOWN, and RONALD M. GOULD, Circuit Judges.

McKEOWN, Circuit Judge:

During his meteoric rise from serving as a local Ukrainian official to Prime Minister of Ukraine, Pavel Ivanovich Lazarenko formed multiple business relationships and engaged in a tangled series of business transactions that netted him millions of dollars. Lazarenko kept his money in foreign bank accounts, transferring funds from one account to another across the globe in an effort, so he was accused, to disguise and conceal the sources and ownership of the proceeds from the Ukrainian people. After the money passed through bank accounts in the United States, from Swiss, off-shore, and other accounts, the United States charged him in a 53–count indictment with conspiracy, money laundering, wire fraud, and interstate trans-

portation of stolen property. Lazarenko was convicted on fourteen counts and now challenges those convictions on appeal. We affirm eight of his convictions, but reverse six others.

## I. BACKGROUND

During the 1990s, Lazarenko was a public official in Ukraine. For several years he served in regional governmental positions, including as Governor of the Dnepropetrovsk region of Ukraine. He rose to the level of Ukrainian First Vice Prime Minister in 1995 and in May 1996, Lazarenko was appointed Prime Minister. Following a rift in his relationship with President Leonid Kuchma, he was dismissed from this position in July 1997. He then became a member of the Ukrainian Parliament and led the opposition Hromada Party.

While serving as a government official, Lazarenko became involved in the affairs of a number of businesses and formed relationships with prominent businessmen. The United States alleged that certain of Lazarenko's business relationships amounted to extortion and that he defrauded the Ukrainian people by obtaining interests in companies, allocating privileges to cronies, and then failing to disclose his assets and wealth as required on Ukrainian financial disclosure forms. The government identified five arrangements that formed the basis for the charges in the indictment.

### A. THE UNDERLYING SCHEMES

#### 1. *Extortion of Kiritchenko*

According to testimony at trial, Lazarenko was extremely powerful as the governor of the Dnepropetrovsk region of Ukraine and in his other public roles. He required businesses to pay him fifty percent of their profits in exchange for his influence to make the businesses successful. Conversely, Lazarenko used his influence to disadvantage the businesses if he was not paid.

In 1990, Peter Kiritchenko, a businessman, formed a company known as Agrosnabsbyt, which was involved in agriculture and metals. In 1992, Kiritchenko met with Lazarenko because, according to Kiritchenko, "to do any kind of serious trade one needed [Lazarenko's] agreement." Lazarenko informed Kiritchenko that he worked with everyone "50–50," which Kiritchenko interpreted as meaning that Lazarenko would control fifty percent of the business and take fifty percent of the profits. Kiritchenko initially transferred $40,000 to Lazarenko as a gesture of "good faith." In January 1993, Kiritchenko transferred a fifty percent interest in Agrosnabsbyt to Ekaterina Karova, a relative of Lazarenko, and transferred fifty percent of the profits from the business to accounts controlled by Lazarenko. Later, Lazarenko and Kiritchenko partnered to move Lazarenko's money between accounts and together they purchased the European Federal Credit Bank ("EuroFed").

#### 2. *Extortion of Dityatkovsky*

According to the indictment, Lazarenko established a similar relationship with Alexei Alexandrovich Dityatkovsky. In 1993, Lazarenko met Dityatkovsky and took a fifty percent interest in his company, Dneproneft, along with fifty percent of the profits as well. Lazarenko's share went to his driver and to an associate.

#### 3. *Naukovy State Farm*

While Lazarenko was governor of Dnepropetrovsk, he was also actively involved in the operations of Naukovy State Farm ("Naukovy"), a dairy operation that was directed by Mykola Agafonov.[1] Naukovy

1. "Naukovy" is the spelling of the name of the company in Ukrainian. Occasionally the par-

also had secured the right to export metal products and raw materials. Naukovy purchased cattle and farm equipment from a Dutch company, Van der Ploeg von Terpstra ("Van der Ploeg"). Van der Ploeg kept a foreign currency account at ABN Amro Bank for its business with Naukovy (the "ABN Amro account"). Unbeknownst to Van der Ploeg's chief accountant, Agafonov was given access to this account for his own use. Agafonov used the money in the ABN Amro account to, among other things, purchase a BMW and pay his credit card bills.

Lazarenko was also actively involved in the operations at Nikopolsky Metal Works factory ("Nikopolsky"). At his direction, $2.4 million was transferred from Nikopolsky to Van der Ploeg's ABN Amro account supposedly to purchase wheat on behalf of Naukovy to combat a food crisis that was plaguing Ukraine at the time.[2] The accountant for Naukovy and the bookkeeper for Van der Ploeg both testified that they did not know whether wheat was ever purchased. The records reflect that $1.2 million was transferred from the ABN Amro account to Agafonov's account in Hungary at PostaBank (the "PostaBank account"). In turn, $1.205 million was transferred from the PostaBank account to an account known as LIP Handel, controlled by Lazarenko in Switzerland. Lazarenko then transferred the money from this Swiss account to various banks, including a $1.8 million transfer to an account controlled by Kiritchenko at Bank of America in San Francisco, California.

### 4. *United Energy Systems of Ukraine*

Eventually, Lazarenko became the First Prime Minister of Ukraine and was responsible for the energy section within the government. According to the indictment, an associate of Lazarenko's, Yulia Tymoshenko, created a natural gas company, United Energy Systems of Ukraine ("UESU"), which received deliveries of gas from RAO Gazprom. UESU was held in large part by United Energy International, Ltd. ("UEIL"), which was owned by a Turkish national. UESU conveyed title to the gas to UEIL such that payments from Ukrainian customers for gas were diverted to UEIL. UEIL did not pay RAO Gazprom for the gas deliveries with the money it received from customers. Instead, it transferred approximately $140 million to a Cypriot company, Somolli, that was controlled, in part, by Tymoshenko. UEIL and Somolli transferred $97 million to accounts controlled by Kiritchenko in Switzerland, Poland, and the United States. Kiritchenko then transferred $120 million to accounts controlled by Lazarenko in Switzerland and Antigua. Lazarenko made two transfers of $14 million each from one of these accounts to accounts in the United States.

### 5. *PMH/GHP*

Lazarenko and Kiritchenko also allegedly controlled a Panamanian company, GHP Corp. ("GHP"). According to the U.S. government, in 1997, Lazarenko, by then Prime Minister, caused the Ukrainian Cabinet of Ministers to contract with GHP for the purchase of six pre-fabricated homes. GHP turned to Pacific Modern Homes ("PMH") in California and purchased six pre-fabricated homes for $524,763. The Cabinet of Ministers purchased the homes from GHP for $1,416,000. GHP produced false invoices to customs officials to make

---

ties or the record refer to it by its Russian name "Naucnij."

**2.** Nikopolsky Metal Works factory is sometimes referred to in the record and by the parties as "Nikopol" or as "Nikopol Ferroalloy."

it appear that it had shipped the homes and paid $1,416,000 for them. Half of the profit realized by GHP was deposited into an account controlled by Lazarenko.

## B. THE CHARGES

Based on Lazarenko's business activities, the government brought numerous charges. Count 1 charged Lazarenko with conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h), for conducting financial transactions that involved the proceeds of extortion, wire fraud, and receipt and transfer of property that was stolen.

Counts 2 through 5 charged Lazarenko with money laundering, in violation of 18 U.S.C. § 1956(a)(2). The indictment specifically identified four wire transfers from Kiritchenko's ABS Trading account in San Francisco to Lazarenko's account in Geneva, Switzerland in 1994 and early 1995. Counts 6 through 8 charged Lazarenko with money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B). These transactions allegedly occurred in November 1997, August 1998, and September 1998. All the money laundering counts were based on the specific unlawful activities of receipt and transfer of property that was "stolen, unlawfully converted, and taken by fraud," in violation of 18 U.S.C. §§ 2314 and 2315; "extortion as specified in 18 U.S.C. § 1956(c)(7)(B)(ii); and wire fraud in violation of 18 U.S.C. §§ 1343 and 1346." *Id.*

Counts 9 through 30 charged Lazarenko with wire fraud in violation of 18 U.S.C. §§ 1343 and 1346. Specifically, Lazarenko was charged with honest services fraud against the people of Ukraine for obtaining ownership interests in Agrosnabsbyt, Dneproneft, and GHP, using his authority and influence to grant these companies privileges, and receiving money from these businesses. The indictment identified specific wire transfers in 1997 and 1998.

Counts 31 through 53 charged Lazarenko with transportation of stolen property in violation of 18 U.S.C. § 2314. The indictment identified a wire transfer in 1994 and several others in 1997 and 1998.

## C. DISMISSAL OF SOME CHARGES

At the close of the government's case-in-chief, the district court granted in part Lazarenko's Rule 29 motion for a judgment of acquittal. The scope of the indictment was massive and the trial testimony voluminous. The district court carefully reviewed the evidence in addressing the Rule 29 motion. Significantly, the district court dismissed the allegations that related to Lazarenko's relationship with UESU. The district court ruled that the government failed to prove that there was fraud in Lazarenko's alleged dealings with UESU, that Lazarenko's failure to inform the Ukrainian people that he was receiving money from UESU was a material omission in support of the government's property fraud theory, or that there was material harm to support the theory that the UESU dealings constituted honest services fraud. The court also held that the money laundering charges could not rest on the property fraud theory with respect to UESU.

The court further concluded that the evidence did not support charges arising out of the PMH–GHP fraud because the government failed to establish the element of material harm. On the government's motion, the court dismissed the allegations regarding Dityatkovsky. Altogether, the court dismissed 24 counts: counts 9 through 19 (wire fraud), count 30 (wire fraud), counts 32 through 42 (interstate transportation of stolen property), and count 53 (interstate transportation of stolen property).

Following the jury's verdict of guilty on all of the remaining counts, the district court partially granted Lazarenko's renewed Rule 29 motion and dismissed counts 20 through 24 and counts 43 through 52. The court concluded that "[n]o reasonable jury could find that the transfers [in counts 20–23 (wire fraud) and counts 43–46 (interstate transportation of stolen property)] represented the proceeds of Kiritchenko extortion or Naukovy fraud." The court further concluded that counts 24 and 47, for wire fraud and interstate transportation of stolen property, respectively, failed because the government's theory that the funds involved in that alleged transfer had been extorted from Kiritchenko was not supported by the indictment. Finally, the court dismissed counts 48 through 52, which charged Lazarenko with interstate transportation of stolen property, because the court found that there were sufficient clean funds in the accounts at issue to cover the transfers.

Lazarenko now challenges his remaining convictions on counts 1 through 8, 25 through 29, and 31.

## II. ANALYSIS

### A. SUFFICIENCY OF THE INDICTMENT

■ Lazarenko argues that the indictment must be dismissed because it failed to allege that his conduct violated Ukrainian law. We review the sufficiency of an indictment de novo. *United States v. Berger,* 473 F.3d 1080, 1097 (9th Cir.2007). An indictment is sufficient if it (1) "contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend" and (2) "enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Hamling v. United States,* 418 U.S. 87, 117, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974). "[A]n indictment 'should be read in its entirety, construed

according to common sense, and interpreted to include facts which are necessarily implied.'" *Berger,* 473 F.3d at 1103 (quoting *United States v. King,* 200 F.3d 1207, 1217 (9th Cir.1999)). "Unless the defendant was misled and thereby prejudiced, neither an error in a citation nor a citation's omission is a ground to dismiss the indictment or information or to reverse a conviction." Fed.R.Crim.P. 7(c)(3).

The indictment tracks the statutory language in charging money laundering, wire fraud and interstate transportation of stolen property. We have previously held that those statutes set forth the essential elements of these offenses. *See United States v. Savage,* 67 F.3d 1435, 1441 (9th Cir.1995) (money laundering); *United States v. Ladum,* 141 F.3d 1328, 1341 (9th Cir.1998) (money laundering); *United States v. Bonallo,* 858 F.2d 1427, 1433 (9th Cir.1988) (wire fraud); *United States v. Rosi,* 27 F.3d 409, 414–15 (9th Cir.1994) (interstate transportation of stolen property). Lazarenko seeks to import an additional element into these offenses, claiming that the Ukrainian law at issue is also an essential element because the government must prove a violation of Ukrainian law to sustain a conviction.

■ Nothing in our case law supports requiring the government to plead a specific violation of foreign law in an indictment. Indeed, Lazarenko's challenge does not achieve novelty status simply because it involves foreign law. To analyze his claim, we look for guidance to our general precedent on indictments. For example, when bringing charges of money laundering, the government need not allege all the elements of the "specified unlawful activity," i.e., the underlying offense. *See United States v. Lomow,* 266 F.3d 1013, 1017 (9th Cir.2001); *United States v. Golb,* 69 F.3d 1417, 1429 (9th Cir.1995). Here, the

violation of Ukrainian law is the specified unlawful activity.

Nor can it be said that the omission of a citation to foreign law in the charges of wire fraud and interstate transportation of stolen property misled or prejudiced Lazarenko. *See* Fed.R.Crim.P. 7(c)(3). The indictment provided detailed allegations regarding the basis for the charges, including dates, amounts, account numbers, and sources of the money. *Cf. Berger*, 473 F.3d at 1101. Significantly, the jury was instructed that it had to find a violation of Ukrainian law and was provided with the elements of the relevant Ukrainian statutes.

Relying on *Richardson v. United States*, 526 U.S. 813, 119 S.Ct. 1707, 143 L.Ed.2d 985 (1999), Lazarenko contends that there is a long list of predicate offenses to the money laundering statute and without a finding regarding the specific predicate offense, there is a risk of disagreement among the jurors as to what the defendant did. This argument falters, though, because not only did the Supreme Court not comment on the sufficiency of an indictment in *Richardson*, here the indictment identified interstate transportation of stolen property, extortion, and wire fraud as the "specified unlawful activit[ies]" and provided detailed allegations regarding each of these offenses. There was little room for jurors to disagree on the underlying offenses. The indictment against Lazarenko was legally sufficient.

### B. Wire Fraud Charges—Counts 25 through 29

Lazarenko claims that the government constructively amended the indictment following the court's dismissal of the UESU allegations by changing its theory to argue that the wire transfers charged as wire fraud in counts 25 and 26 of the indictment were in furtherance of the Naukovy fraud.

He also challenges the sufficiency of the evidence on counts 25 through 29.

 We review de novo whether there has been a constructive amendment to an indictment. *United States v. Pang*, 362 F.3d 1187, 1193 (9th Cir.2004). "A constructive amendment occurs when the defendant is charged with one crime but, in effect, is tried for another crime." *Pang*, 362 F.3d at 1193.

The indictment charged generally that the accounts involved in the transfers alleged as wire fraud in counts 25 to 26 received proceeds from both fraud and extortion. However, under the heading "The UESU Fraud," the government alleged more specifically that

> Between February of 1996 and September of 1997, the money from Somolli, along with other funds, totaling more than $120,000,000 was transferred from Kiritchenko's accounts into accounts controlled by Lazarenko in Switzerland and Antigua. Thereafter, Lazarenko transferred portions of these funds from Switzerland into bank accounts in the Northern District of California, including two transfers of $14,000,000 each on August 1, 1997.

Count 25 and count 26 both allege a transfer of $14 million into a bank account in the Northern District of California on August 1, 1997. The plainest reading of these allegations is that the transfers in counts 25 and 26 are the same two transfers alleged under the heading "The UESU Fraud." When the district court dismissed the UESU allegations after the close of the government's case-in-chief, counts 25 and 26 should have been dismissed as well.

The government asserted in its brief that the $14 million transfers were not necessarily funds derived from the UESU scheme because the indictment alleged

that money from Somolli, *"along with other funds,"* was deposited into Lazarenko's Swiss bank account. We decline to read this catch-all phrase as turning the two $14 million transfers into proceeds from the Naukovy fraud. The paragraph in which these allegations are found begins, "Lazarenko ... received and transferred money that had been stolen, converted and taken by fraud in connection with the distribution of natural gas in Ukraine as follows." Each allegation following relates directly to the UESU scheme, including allegations about the parties involved and payments between UEIL, Somolli, and UESU. It simply makes no sense to read this paragraph as concluding with Lazarenko transferring money from a completely different scheme. The details of the transfers in this paragraph and in counts 25 and 26 are identical and the only logical conclusion that can be drawn is that those counts are premised on the UESU scheme.

At oral argument, the government claimed that an allegation in a later paragraph, paragraph 35, supported its argument that the transfers of $14 million in counts 25 and 26 were part of the Naukovy fraud. This paragraph, though, does not advance the government's position. The portion of the paragraph to which the government points merely alleges that "[b]etween 1993 and 1994, Lazarenko received at least $14,000,000 from Naukovy State Farm." This allegation neither speaks to whether *two* transfers of $14 million were made in August 1997, nor does anything there cause us to read the allegations under "The UESU Fraud" any differently.

Even with the government's shift in theory, the government failed to provide sufficient evidence to support Lazarenko's wire fraud convictions on counts 25 and 26, as well as on counts 27, 28, and 29. We evaluate a challenge to the sufficiency of the evidence by viewing the evidence in the light most favorable to the prosecution. *Jackson v. Virginia,* 443 U.S. 307, 324, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Evidence is sufficient to support a conviction if, viewed in this light, a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.*

We first address a threshold question, namely whether the government must trace the wire transfer proceeds back to some unlawful activity. Lazarenko puts it this way: whether "a wire transfer not proven to contain proceeds of theft or fraud for the purpose of a transporting stolen property offense [can] be found, on the same evidence, to contain such illegal proceeds." This argument piggy-backs on the government's burden in the context of interstate transportation of stolen property.

▮ To sustain a conviction for interstate transportation of stolen property, the government must prove that the money transported was stolen, converted, taken by fraud, or derived from such property. *See United States v. Morgan,* 805 F.2d 1372, 1377–78 (9th Cir.1986). The property must be "directly traceable" to the fraud or theft. *Id.* at 1378. By contrast, in a money laundering charge, the commingling of tainted money with clean money taints the entire account. *See United States v. English,* 92 F.3d 909, 916 (9th Cir.1996). The money transferred from a commingled account does not need to be traceable to fraud, theft, or any wrongdoing at all. It is enough that the money, even if innocently obtained, was commingled in an account with money that was obtained illegally. *See id.*

▮ Wire fraud does not necessarily rest on the characterization of the funds. It is well-established that the wire used in the wire fraud scheme need only have been "in furtherance" of the scheme.

*Schreiber Distrib. Co. v. Serv–Well Furniture Co., Inc.,* 806 F.2d 1393, 1399–1400 (9th Cir.1986); *see, e.g., United States v. Johnson,* 297 F.3d 845, 871 (9th Cir.2002) (upholding a wire fraud conviction where the wire involved was a telephone call). In a case such as this, where the wire at issue is a wire transfer of funds that are connected to an unlawful activity, the "in furtherance" inquiry may be met without a strict tracing of the wired funds. We decline to narrow the "in furtherance" focus by requiring the funds to be traced back to a particular unlawful activity.[3]

■ We turn, then, to the question whether the wire transfers alleged in counts 25 to 29 were "in furtherance" of the Naukovy fraud. To support a wire fraud charge, the wire must be "incident to the execution of the scheme" and not "part of an after-the-fact transaction that, although foreseeable, was not in furtherance of the defendant's fraudulent scheme." *United States v. Lo,* 231 F.3d 471, 478 (9th Cir.2000) (explaining the principle in the context of mail fraud);[4] *United States v. Manarite,* 44 F.3d 1407, 1413 (9th Cir. 1995) (finding that mailings and phone calls made after a "one-shot" credit scam was completed were not in furtherance of an ongoing scheme). The importance of the temporal aspect of the wire transfer to the underlying scheme is best illustrated in our case law: "[T]he pertinent question is not whether or not the defendant 'had obtained all the money[she] expected to get' before the [wire] occurred. Rather, ... the [wire] can occur after the defendant has obtained her fee, if 'the [wire] is

part of the execution of the scheme as conceived by the perpetrator at the time.' " *Lo,* 231 F.3d at 478 (quoting *United States v. Sampson,* 371 U.S. 75, 79, 83 S.Ct. 173, 9 L.Ed.2d 136 (1962); *Schmuck v. United States,* 489 U.S. 705, 715, 109 S.Ct. 1443, 103 L.Ed.2d 734 (1989)).

■ The wire transfers at issue occurred in 1997 and 1998, approximately three or four years after the money was wired into the account. Counts 25 and 26 are transfers of $14 million from Lazarenko's CARPO–53 account in Switzerland to Kiritchenko's EuroFed accounts at Pacific Bank in California and at Commercial Bank of San Francisco. Count 27 is a transfer of $24 million from Lazarenko's EuroFed account in Switzerland to a EuroFed account at Hambrecht & Quist in California. Counts 28 and 29 are transfers of $9 million and $5.3 million from Lazarenko's Lady Lake account in the Bahamas to Kiritchenko's account at Commercial Bank of San Francisco and to an account controlled by Lazarenko at WestAmerica Bank in California.

The government's theory was that these transfers were meant to hide Lazarenko's fraudulent activity as he sought political office. Kiritchenko testified at trial that Lazarenko closed his CARPO–53 bank account in Switzerland in 1997, after Lazarenko was dismissed as Prime Minister. This account contained close to $200 million. He explained that Lazarenko made the transfers that are alleged in counts 25 to 29 of the indictment because he was

---

3. Thus, we are not persuaded by Lazarenko's argument that there was instructional error with respect to the wire fraud counts. The district court correctly instructed the jury that it needed to determine whether the wire was "an important part of the scheme," defining "important" as "incident to an essential part of the scheme." The court was not required

to instruct the jury on how to determine whether the accounts contained the proceeds from a fraud.

4. "It is well settled that cases construing the mail fraud and wire fraud statutes are applicable to either." *United States v. Shipsey,* 363 F.3d 962, 971 n. 10 (9th Cir.2004).

under investigation in Ukraine and did not want his assets frozen.

Under the facts of this case, we conclude no rational trier of fact could find that these transfers in 1997 and 1998 were "in furtherance" of the Naukovy fraud, which centered on allegedly shady agricultural and personal purchases. The fraudulent activity was completed, and the money concealed, in 1994, when the money reached Lazarenko's control and he deposited it into coded bank accounts where it remained for three years. Subsequent transfers were not part of the scheme as it was originally conceived. *Cf. Lo*, 231 F.3d at 478. Nothing in the evidence supports an inference, let alone a conviction, on the grounds that the transfers were simply a delayed link in the fraudulent chain.

If the government's theory were correct, then it would be possible for an ordinary fraud to be converted into wire fraud simply by the perpetrator picking up the telephone three years later and asking a friend if he can store some fraudulently-obtained property in his garage before the police execute a search warrant or later taking the proceeds of fraud and transferring them to another bank. The government's theory extends an already broad statute too far. Concealing the source and ownership of fraudulently-obtained property in downstream transactions is better understood as money laundering absent evidence that the wire transfer is "incident to an essential part of the scheme." *Lo*, 231 F.3d at 478 (quoting *Pereira v. United States*, 347 U.S. 1, 8, 74 S.Ct. 358, 98 L.Ed. 435 (1954)) (emphasis omitted).

We reverse Lazarenko's convictions on counts 25 through 29.

## C. MONEY LAUNDERING—COUNTS 6 THROUGH 8

Our reversal of Lazarenko's convictions on counts 25 to 29 does not, as Lazarenko urges, require us to reverse his convictions on counts 6, 7, and 8 for money laundering. Count 6 alleged that in November 1997 Lazarenko laundered $6 million from a EuroFed account at Commercial Bank in San Francisco to another EuroFed account. Just three months earlier, in August 1997, the Commercial Bank account had received the $14 million transfer that was charged as wire fraud in count 26. Count 7 alleged that Lazarenko laundered $6.745 million by drawing a check on the account of one of his companies, Dugsbery, Inc., and using it to purchase a home in Marin County, California, in 1998. Count 8 charges Lazarenko with an unlawful transfer of $2.3 million from one Dugsbery account at WestAmerica Bank to another at Bank Boston Robertson Stevens, also in 1998. The money in the Dugsbery account can be traced to Lazarenko's Lady Lake bank account in the Bahamas; the transfer of money from Lady Lake to the Dugsbery account was charged as wire fraud in count 29.

The funds in the San Francisco EuroFed account and in the Dugsbery WestAmerica account can be traced back to Lazarenko's large CARPO–53 account, where he deposited proceeds from his Naukovy fraud and from his extortion of Kiritchenko. The government contends that even if Lazarenko's wire fraud convictions are reversed, the money laundering charges in counts 6, 7, and 8 still rest on Lazarenko's laundering of funds extorted from Kiritchenko.

The government was somewhat inconsistent in how it portrayed these counts to the jury. During its closing argument, when summing up counts 6, 7, and 8, the government at times referred only to the fraud allegations, making no mention of extortion proceeds. Nonetheless, argument is not evidence, and the evidence shows that proceeds from extortion ended

up in the EuroFed accounts and in the Dugsbery account. At trial, the government showed that Lazarenko laundered proceeds from the extortion. Recognizing that we consider these facts in the light most favorable to the government, *Jackson*, 443 U.S. at 324, 99 S.Ct. 2781, we affirm the convictions on counts 6, 7, and 8.

### D. MONEY LAUNDERING—COUNTS 2 THROUGH 5

 We affirm Lazarenko's money laundering convictions on counts 2 through 5. The statute clearly lists "extortion" as a foreign offense that may be a predicate offense for money laundering. 18 U.S.C. § 1956(c)(7)(B)(ii). Lazarenko asserts that "extortion" as it was used in the money laundering statute, 18 U.S.C. § 1956, at the time of his conduct, is limited to extortion through violence and the extortion he is charged with is more akin to bribery. We review de novo "[t]he district court's interpretation of the money laundering statute ... and the scope of the conduct covered by the statute." *United States v. Deeb*, 175 F.3d 1163, 1166–67 (9th Cir. 1999).

Generally speaking, § 1956 criminalizes the laundering of the proceeds of a "specified unlawful activity." 18 U.S.C. § 1956. During the period alleged in the indictment against Lazarenko, 1992–1998, "specified unlawful activity" was defined to include:

(A) any act or activity constituting an offense listed in section 1961(1) of this title except an act which is indictable under subchapter II of chapter 53 of title 31;

(B) with respect to a financial transaction occurring in whole or in part in the United States, an offense against a foreign nation involving

(i) the manufacture, importation, sale, or distribution of a controlled substance (as such term is defined for the purposes of the Controlled Substances Act)....

(ii) kidnapping, robbery, or extortion; or[5]

(iii) fraud, or any scheme or attempt to defraud, by or against a foreign bank (as defined in paragraph 7 of section 1(b) of the International Banking Act of 1978).

18 U.S.C. § 1956(c)(7) (1992). In 2001, Congress amended this section to include "bribery of a public official, or the misappropriation, theft, or embezzlement of public funds by or for the benefit of a public official" as a "specified unlawful activity." 18 U.S.C. § 1956(c)(7)(B)(iv).

 Extortion, as it is criminalized under the Hobbs Act, 18 U.S.C. § 1951, can be committed through the threat of violence or under color of official right. *See Evans v. United States*, 504 U.S. 255, 261–62, 112 S.Ct. 1881, 119 L.Ed.2d 57 (1992). Lazarenko urges that "extortion" as it is used in § 1956 does not include non-violent foreign extortion. He claims that such conduct is equivalent to foreign bribery and public corruption and that these offenses were beyond the reach of federal law until the Patriot Act of 2001.[6]

"It is a familiar 'maxim that a statutory term is generally presumed to have its common law meaning.'" *Evans*, 504 U.S. at 259, 112 S.Ct. 1881 (quoting *Taylor v.*

---

**5.** In 1996, Congress amended this clause to add "or destruction of property by means of explosive or fire." *See* 18 U.S.C. § 1956(c)(7)(B)(ii).

**6.** The Foreign Corrupt Practices Act punished those who offered bribes to foreign officials, but did not reach the foreign officials who received the bribes. 15 U.S.C. §§ 78dd–1, 78dd–2; *United States v. Castle*, 925 F.2d 831, 833–34 (5th Cir.1991).

*United States,* 495 U.S. 575, 592, 110 S.Ct. 2143, 109 L.Ed.2d 607 (1990)). At common law, extortion was a crime that resembled what we know as bribery, and involved an abuse of power by a public official. *Id.* at 260, 112 S.Ct. 1881. Federal statutes have expanded that definition to include the obtaining of property by force. *Id.* at 261, 112 S.Ct. 1881.

We presume that Congress was aware of the common law meaning of extortion when it enacted § 1956. As the Supreme Court has explained,

> [W]here Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken and the meaning its use will convey to the judicial mind unless otherwise instructed. In such case, absence of contrary direction may be taken as satisfaction with widely accepted definitions, not as a departure from them.

*Evans,* 504 U.S. at 259–60, 112 S.Ct. 1881 (quoting *Morissette v. United States,* 342 U.S. 246, 263, 72 S.Ct. 240, 96 L.Ed. 288 (1952)). Significantly, Congress did not qualify the term in any way that suggests that we should read "extortion" as excluding the common law definition. The fact that "extortion" is listed with "kidnapping" and "robbery" does not compel us to give the term a narrower meaning or one predicated on force or violence.

The 2001 amendment to § 1956 does not become superfluous if we read "extortion" to include extortion under color of official right. Bribery and extortion under color of official right are not co-extensive.

"Bribery of a public official" extends to the individual who offers the bribe as well as to the public official who accepts the bribe.[7] "Misappropriation, theft, or embezzlement of public funds by or for the benefit of a public official" will also capture conduct not punishable as "extortion under color of official right" because misappropriation, theft, and embezzlement do not necessarily require the quid pro quo of an official action. *See Evans,* 504 U.S. at 258–59, 112 S.Ct. 1881.

The Supreme Court's recent decision in *United States v. Santos,* —— U.S. ——, 128 S.Ct. 2020, 170 L.Ed.2d 912 (2008), does not change our analysis of the statute. In *Santos,* the Supreme Court examined the word "proceeds" as it was used in § 1956. *See id.* at 2023–26. The Court concluded that the term, left undefined in the statute, was ambiguous as to whether it meant "profits" or "receipts," and so defined it in the more defendant-friendly terms of "profits," based on the rule of lenity. *Id.* at 2025.

Critical to the issue here, the Court began its analysis by reaffirming the principle that "[w]hen a term is undefined, we give it its ordinary meaning." *Id.* at 2024. This principle both starts and ends our analysis. The term "extortion" has an ordinary meaning and it is not ambiguous. Unlike the word "proceeds," "extortion" has a common law meaning and federal statutes use the term to mean both extortion by violence and extortion under color of official right. *See, e.g., Evans,* 504 U.S. at 261, 112 S.Ct. 1881; *James v. United States,* 550 U.S. 192, 127 S.Ct. 1586, 1604–05, 167 L.Ed.2d 532 (2007) (Scalia, J. dissenting) (citing the Travel Act, 18 U.S.C. § 1952, the Hobbs Act, 18 U.S.C. § 1951,

---

7. The federal bribery statute punishes both one who "corruptly gives, offers or promises anything of value to any public official" and public officials who "corruptly demand[ ], seek[ ], receive[ ], accept[ ] or agree[ ] to receive or accept anything of value." 18 U.S.C. §§ 201(b)(1), (2).

RICO, 18 U.S.C. § 1961, and the Model Penal Code § 223.4 as examples of statutes with a broad interpretation of "extortion").

Lazarenko has not directed us to any statute where Congress used the word "extortion" and meant only extortion by violence *or* only extortion under color of official right. *Cf. Santos,* 128 S.Ct. at 2024 (observing that Congress "sometimes has defined [proceeds] to mean 'receipts' and sometimes 'profits.' "). The ambiguity that the Court wrestled with in *Santos* is simply absent with respect to "extortion."

Lazarenko's money laundering convictions on counts 1 through 8 are also supported by the predicate offenses of wire fraud and interstate transportation of stolen property. *See* 18 U.S.C. § 1956(c)(7)(A). Neither wire fraud nor interstate transportation of stolen property needs to be listed under "offenses against a foreign nation" for Lazarenko's convictions to be affirmed. Lazarenko was charged with violating the law of the United States by using a wire within this country in furtherance of his fraud or to transport funds that are derived from fraud. That the underlying conduct occurred elsewhere does not convert wire fraud or interstate transportation of stolen property into an offense against a foreign nation.

### E. INTERSTATE TRANSPORTATION OF STOLEN PROPERTY—COUNT 31

■ Lazarenko also challenges the sufficiency of the evidence for his conviction on count 31 for interstate transportation of stolen property. Count 31 alleges a transfer of $1.8 million from Lazarenko's LIP Handel account in Switzerland to Kiritchenko's ABS Trading account at Bank of America in California. As noted earlier, this charge requires a tracing of the fraud proceeds, not simply a commingled account. What is totally missing here is

evidence from the key account at the Hungarian PostaBank, from which the money was transferred into the LIP Handel account.

According to the testimony of the former director of Nikopolsky, Boris Velychko, in 1992, Lazarenko's deputy negotiated for Nikopolsky to loan $2.4 million to a Dutch company, Van der Ploeg, on behalf of Naukovy to purchase wheat. The $2.4 million was transferred to Van der Ploeg's account at ABN Amro Bank in the Netherlands in December 1992. The loan to Naukovy was repaid in local currency, which, according to Velychko, was devalued in 1993. On January 19, 1993, $1.2 million was transferred from the ABN Amro account to Agafonov's account at PostaBank in Hungary. In June 1993, $1.205 million was transferred from the PostaBank account to Lazarenko's LIP Handel account in Switzerland. In July 1994, $1.8 million was transferred from the LIP Handel account to Kiritchenko's ABS Trading account at Bank of America in San Francisco. It is this final transfer that is charged as the interstate transportation of stolen property in count 31.

Anyone who "transports, transmits, or transfers in interstate or foreign commerce any goods, wares, merchandise, securities or money, of the value of $5,000 or more, knowing the same to have been stolen, converted or taken by fraud" is guilty of interstate transportation of stolen property. 18 U.S.C. § 2314. We will uphold the conviction if, viewing the evidence in the light most favorable to the government, there is sufficient evidence for a rational juror to find guilt beyond a reasonable doubt. *Jackson,* 443 U.S. at 324, 99 S.Ct. 2781.

The ledger from Van der Ploeg's account at ABN Amro shows a transfer of $1.2 million to an account at PostaBank, and the ledger for Lazarenko's LIP Han-

del at Union Bank of Switzerland shows a receipt of $1.205 million from PostaBank, but the glaring gap is that there are no records from PostaBank at all. The government was unable to produce any documents from PostaBank itself. Lazarenko asserts that this gap is fatal to the government's charge of interstate transportation of stolen property because without those records it is impossible to know whether the $1.205 million that was transferred to LIP Handel was the proceeds of fraud or derived from the proceeds of fraud. We agree.

The district court instructed the jury that to find Lazarenko guilty of interstate transportation of stolen property, the funds that were transferred must be the proceeds of fraud or derived from the proceeds of fraud. This rule has its roots in *United States v. Poole*, 557 F.2d 531 (5th Cir.1977). There, the defendant, Poole, deposited a check that contained fraudulently-obtained funds into his bank account and then, on the same day, wrote a check on that account for an amount identical to the amount that had been deposited. *Id.* at 533–34. He deposited that check into an out-of-state bank. *Id.* The Fifth Circuit reversed the conviction because the bank account into which Poole deposited the fraudulently-obtained funds had sufficient clean funds to cover the amount of the check that was transported across state lines. *Id.*

The government relies on the Seventh Circuit's ruling in *United States v. Quintanilla*, 2 F.3d 1469 (7th Cir.1993), to argue that it does not matter whether there were sufficient clean funds in the Posta-Bank account to cover the transfer of $1.205 million to the LIP Handel account. In *Quintanilla*, the defendants were found guilty of defrauding the G. Heileman Brewing Company's corporate sponsorship program and convicted of, among other charges, interstate transportation of stolen property. *Id.* at 1471. Defendant Monreal, the director of the program, devised a scheme to receive kickbacks from organizations who received sponsorship awards. *Id.* The money passed from Heileman to the organization and the organization would, in turn, pass a portion to Monreal. *Id.* Quintanilla was the director of one of the organizations, Operation Search, that had kicked money back to Monreal. *Id.* Quintanilla argued on appeal that Operation Search had sufficient clean funds in its account each time a kickback check was drawn and transported to Monreal. *Id.* at 1478. The Seventh Circuit rejected this argument. It explained that,

> [t]he evidence at trial showed, and Quintanilla does not dispute, that he agreed to pay Monreal a portion of every Heileman grant that Operation Search received. Accordingly, the ultimate source of the funds used to pay Monreal was Heileman. The evidence also showed that Quintanilla followed Monreal's directions concerning exactly how the kickbacks were to be made; there is no suggestion that these directions were not followed to the last detail. Given the nexus between the Heileman grants and the kickbacks made to Monreal, we do no[t] think § 2314 liability hinges in this case on whether or not Operation Search had sufficient clean funds in its bank account each time a kickback check was drawn and transported across state lines to Monreal.

*Id.* at 1478–79 (footnote omitted). The court looked at the purpose behind § 2314, and noted specifically that the statute was meant to prevent those who were attempting to " 'utilize the channels of interstate commerce make a successful get away.' " *Id.* at 1479 (quoting *United States v. Sheridan*, 329 U.S. 379, 384, 67 S.Ct. 332, 91 L.Ed. 359 (1946)). It concluded that "[l]ooking to the substance of Quintanilla's

conduct, it is apparent that the checks he caused to be transported in interstate commerce represented, and were directly derived from, fraudulently obtained Heileman funds." *Id.*

*Quintanilla* does not save the government in this case because the evidence of the nexus between the grants and the kickbacks in that case was sufficient. Here, the chain of alleged kickbacks from the wheat deal is missing a few links. More significantly, though, the jury here was instructed in accordance with *Poole* and the government did not object to the premises underlying that decision.

In any event, even if we infer that Lazarenko was connected to the wheat deal because it was negotiated by his deputy and he received a payment that represented approximately fifty percent of the proceeds, PostaBank records are still required for there to be sufficient evidence that Lazarenko's subsequent transfer of $1.8 million to Kiritchenko constituted interstate transportation of stolen property. The government's argument that the transfer of $1.205 million to Lazarenko's LIP Handel account was the proceeds of fraud because the fraud was not complete until the money reached Lazarenko does not persuade us that the PostaBank records are unnecessary.

For the $1.8 million transferred from Lazarenko's LIP Handel account to Kiritchenko's ABS Trading account to be fraudulently-obtained property, it must have contained at least $5,000 of the $2.4 million transferred to Van der Ploeg in the phony wheat deal. We cannot look only at whether the $1.8 million contained at least $5,000 of the $1.205 million transferred into Lazarenko's LIP Handel account as

the government urges because the evidence viewed in the light most favorable to the government shows only that the $1.205 million payment was an extortion payment, i.e., fifty percent of the proceeds from the phony wheat transaction.[8] The fraud was Lazarenko's deputy arranging for Nikopol to give Van der Ploeg $2.4 million to buy wheat that was never purchased. That fraud was completed when the money was transferred to Van der Ploeg.

The record supports an inference that Lazarenko *extorted* $1.205 million from Agafonov, because Lazarenko always extorted half of the profits from businesses. But making an extortion payment and completing a fraud are entirely different propositions. The $1.205 million extortion payment also may have been money derived from the phony wheat deal. Without the records from PostaBank, which would show whether there were clean funds in the account from which Agafonov could make the required payment to Lazarenko, this inference is speculation. In short, the evidence reflects money into the Hungarian account and money out of the account, but missing is evidence about the account itself and whether the transferred money was "directly traceable" to the fraud itself. *See Morgan,* 805 F.2d at 1378. Accordingly, we reverse Lazarenko's conviction on count 31.[9]

## F. RETROACTIVE MISJOINDER

Lazarenko also appeals the denial of his Rule 33 motion for a new trial. He argues that the government indicted him on the UESU charges, knowing that the charges could not be proven, and then, after the directed verdict of acquittal, used the evi-

---

8. Kiritchenko testified that Lazarenko worked with everyone 50–50. We give the government the benefit of the inference that Lazarenko worked with Agafonov 50–50 as well.

9. Because we reverse Lazarenko's conviction on this count, we do not need to reach his argument that the government's closing argument was misleading.

dence from the alleged UESU scheme against him in its closing argument, in violation of the doctrine of retroactive misjoinder.[10] He asserts that he was denied the opportunity to respond in his own closing argument to the government's misleading statements.

We review for an abuse of discretion the district court's denial of a motion for a new trial made on the grounds of retroactive misjoinder. *United States v. Aldrich,* 169 F.3d 526, 528 (8th Cir.1999). Although we consider de novo whether a defendant has been deprived of his constitutional right to present closing argument, *see United States v. Igbinosun,* 528 F.3d 387, 391 (5th Cir.2008), a district court's limitation on a closing argument is reviewed for an abuse of discretion. *United States v. Spillone,* 879 F.2d 514, 518 (9th Cir.1989).

The Federal Rules of Criminal Procedure allow for several offenses and several defendants to be joined in a single indictment. If, however, some of the offenses or defendants are dismissed mid-trial, in some cases the trial court must sever the proceedings in order to protect the defendant from prejudice. *See Schaffer v. United States,* 362 U.S. 511, 514, 80 S.Ct. 945, 4 L.Ed.2d 921 (1960).

As the Second Circuit explained in *Vebeliunas,*

" 'Retroactive misjoinder' arises where joinder of multiple counts was proper initially, but later developments—such as a district court's dismissal of some counts for lack of evidence or an appellate court's reversal of less than all convictions—render the initial joinder improper. In this Circuit, '[t]o invoke retroactive misjoinder,' a defendant 'must show compelling prejudice.' Prejudicial spillover from evidence used to obtain a conviction subsequently reversed on appeal may constitute compelling prejudice."

*Vebeliunas,* 76 F.3d at 1293–94 (internal citations omitted) (quoting *United States v. Jones,* 16 F.3d 487, 493 (2d Cir.1994)). The First Circuit has set a high bar for proving prejudicial spillover: "[A] claim of prejudicial spillover cannot succeed unless 'a defendant ... prove[s] prejudice so pervasive that a miscarriage of justice looms.' " *United States v. Trainor,* 477 F.3d 24, 36 (1st Cir.2007) (quoting *United States v. Levy–Cordero,* 67 F.3d 1002, 1008 (1st Cir.1995)).

We have examined the issue of prejudicial spillover in the context of a defendant's motion to sever his trial from a co-defendant. In *United States v. Cuozzo,* 962 F.2d 945 (9th Cir.1992), we stated that, "[i]n assessing the prejudice to a defendant from the 'spillover' of incriminating evidence, the primary consideration is whether 'the jury can reasonably be expected to compartmentalize the evidence as it relates to separate defendants, in view of its volume and the limited admissibility of some of the evidence.' " *Id.* at 950 (quoting *United States v. Escalante,* 637 F.2d 1197, 1201 (9th Cir.1980)). The trial court's instructions to the jury are a "critical factor" in this assessment. *Cuozzo,* 962 F.2d at 950. Also, "[t]he fact that the jury rendered selective verdicts is highly indicative of its ability to compartmentalize the evidence." *Id.*

At the outset, we reject the government's contention that we have limited the doctrine of retroactive misjoinder only to cases where there is more than one defen-

---

**10.** This doctrine is closely related to prejudicial spillover. The concepts and terms are often used interchangeably. *See United States v. Vebeliunas,* 76 F.3d 1283, 1293–94 (2d Cir. 1996).

dant. The government reads *United States v. Anguiano*, 873 F.2d 1314 (9th Cir.1989), too broadly. In *Anguiano*, we held that the trial court did not err in refusing to give a multiple conspiracies instruction where there was a single defendant. *Id.* at 1318. We stated that,

> [a] multiple conspiracies instruction is generally required where the indictment charges several defendants with one overall conspiracy, but the proof at trial indicates that a jury could reasonably conclude that some of the defendants were only involved in separate conspiracies unrelated to the overall conspiracy charged in the indictment. The instruction is required because, in such a situation, there is a possibility of prejudicial variance between the indictment and the trial proof. The variance may be prejudicial in a number of ways, but the problem that is of concern here is the possibility of transference or "spillover" of guilt. In this type of situation, one of the defendants argues that he or she was only involved, if at all, in a minor conspiracy that is unrelated to the overall conspiracy charged in the indictment, and that a multiple conspiracies instruction is required in order to ensure that there is no "spillover" of guilt from one defendant to another. However, there is no problem of spillover when, as in this case, the defendant stands trial alone. Accordingly, Anguiano was not entitled to a multiple conspiracies instruction on this basis.

*Id.* at 1317–18 (internal citations and footnotes omitted). We did not hold broadly that the doctrine of prejudicial spillover is inapplicable where there is only one defendant.

■ The government's citation to the Seventh Circuit's decision in *United States v. Holzer*, 840 F.2d 1343 (7th Cir.1988), as limiting the applicability of the doctrine of prejudicial spillover or retroactive misjoinder, also misses the mark. The Seventh Circuit stated that "[n]o rule of evidence is violated by the admission of evidence concerning a crime of which the defendant is acquitted, *provided the crime was properly joined to the crime for which he was convicted and the crimes did not have to be severed for purposes of trial.*" *Id.* at 1349 (emphasis added). The Seventh Circuit thus is consistent with our sister circuits in recognizing that there are circumstances where charges in a trial must be severed to avoid prejudice. *See, e.g., Vebeliunas*, 76 F.3d at 1293–94; *Aldrich*, 169 F.3d at 528. We thus clarify that the doctrine of prejudicial spillover or retroactive misjoinder may apply to a case where there is only one defendant.

■ Invoking the three-factor test that the Second Circuit developed in *Vebeliunas*, the district court concluded that Lazarenko was not prejudiced by the now-dismissed charges. Under the *Vebeliunas* test, the court considers: (1) whether the evidence was so inflammatory that it would tend to cause the jury to convict on the remaining counts; (2) the degree of overlap and similarity between the dismissed and remaining counts; and (3) a general assessment of the strength of the government's case on the remaining counts. *Vebeliunas*, 76 F.3d at 1294. These factors reasonably address concerns about prejudicial spillover. We adopt these factors and add to them the factors we identified in *Cuozzo*—whether the trial court diligently instructed the jury and whether there is evidence, such as the jury's rendering of selective verdicts, to indicate that the jury compartmentalized the evidence. *Cuozzo*, 962 F.2d at 950.

■ The district court did not abuse its discretion in denying Lazarenko a new trial based on prejudicial misjoinder. The court first found that the evidence present-

ed in connection with the UESU and GHP frauds was not inflammatory. It was not persuaded that the jury "threw up their hands" over the $200 million associated with the dismissed counts because the jury deliberated for four days and sent questions to the court. Certainly, the UESU scheme was a significant component of the government's case against Lazarenko. But the evidence of fraud, illegal transfers and coverups was so extensive that evidence of $200 million in allegedly unlawful transfers is hardly more inflammatory than evidence of the other transfers or the evidence that Lazarenko extorted fifty percent of the profits from all the businesses he was involved with. The testimony on the $200 million transfer did not amount to compelling prejudice.

The government does not challenge the district court's ruling that some of the evidence would have been inadmissible if the dismissed counts had been dismissed before trial. *See United States v. Hamilton,* 334 F.3d 170, 182 (2d Cir.2003) ("[P]rejudicial spillover is unlikely if the dismissed count and the remaining counts were either quite similar or quite dissimilar.").

Finally, the district court concluded that the government's case on the remaining counts was sufficiently strong. The court sent 29 counts to the jury, but overturned the verdict on 15 counts. We have reversed an additional six counts. This issue presents a closer question, but "[i]t is not necessary that the court agree with jury verdicts on all counts to determine that the jury carefully weighed the evidence." *United States v. Stefan,* 784 F.2d 1093, 1101 (11th Cir.1986). Lazarenko has not explained how the evidence related to the dismissed counts was tainted by the UESU evidence. The overall evidence of fraud was strong, although it was incumbent on the government to weave that

evidence through the technical threads of multiple counts. That the government was not 100% successful does not undermine the evidence that was airtight.

Lazarenko further argues that the prejudicial impact of the evidence on the dismissed counts was compounded in the government's closing argument. He claims that while the government referred to the scheme in the "indictment," he was prevented from arguing that the single conspiracy alleged in count 1 was not proven because the central allegations—the UESU fraud, the GHP/PMH fraud, and the Dityakovsky extortion—were not proven. He further asserts that the government improperly referred to the UESU fraud in arguing that Lazarenko was "never engaged in legitimate business," while he was precluded from responding that the funds from UESU were not unlawful.

The jury did not see the indictment and was not informed of the specific allegations in the indictment related to UESU. The district court gave counsel three guidelines for their closing arguments: (1) counsel could not "implicate the Court and its ruling on the dismissed counts in your argument"; (2) counsel could not "comment on why the theories were no longer before" the jury; and (3) counsel could not "mislead them by way of argument . . . that they can acquit based on the absence" of the UESU counts.

The government's references to the indictment were not improper. The jury was specifically instructed that certain counts were no longer before them, the government stated at the beginning of its closing argument that it was not addressing those counts, and the jury never saw the indictment. With these safeguards in place, the government's mention of "the crimes charged in the indictment," or the schemes "alleged in the indictment,"—references that did not mention UESU—did

not improperly implicate the dismissed UESU counts.

Lazarenko appears to want it both ways. He argues that he was prevented from countering the government's references to the indictment and that he should have been able to argue that the government failed to prove the single conspiracy and wire fraud allegations that it promised to prove because the evidence did not support the UESU, GHP, PMH, and Dityakovsy allegations. In his closing argument, Lazarenko's counsel argued,

> [I]s that plan or scheme that the government is now presenting to you, is that the same plan or scheme that Mr. Lazarenko was charged with, that the government has been prosecuting in this case?
>
> Is what the government's presented to you in final argument the same scheme that they argued to you the whole case?
>
> Remember, the government argued to you that UESU, UEIL, Itera, prefab houses, Nakosta were all part of the scheme.
>
> Now the government argues, the scheme was Naukovy and Kiritchenko alone. That's the scheme.
>
> We will talk more about this, but the defendant has a constitutional right to be tried on only what he has been charged with, and a constitutional right not to be convicted—

The court then sustained "its own objection to that part of the argument."

Outside the presence of the jury, the court explained its view. The court commented that Lazarenko's counsel had "very deftly for the most part . . . complied" with the guidelines. The court stated, though, that counsel crossed the line when he argued that "the defendant has a right under the Constitution . . . to be convicted on the . . . indictment [returned by the grand jury]." The court stated that "[t]here is nothing in our record that tells them about the grand jury, their function or what they do. . . . I did not want to mislead this jury and have them now consider what the grand jury did or didn't do." The court's objection was limited to counsel's references to what had or had not been charged. Lazarenko's counsel was not precluded from arguing that the government did not prove the scheme they initially laid out based on the evidence. At that point, the indictment was not in play. It was not improper for the court to limit the closing argument to the evidence.

We also disagree with Lazarenko's assertion that the government improperly relied on the UESU scheme when it argued that Lazarenko had "never engaged in legitimate business." The government argued to the jury that,

> the evidence in this case shows that throughout this period of time the only position the defendant held was an official position. The only thing he did was exercise his official authority.
>
> He was never engaged in any legitimate business. He never received, legitimately, any income from Kiritchenko or from Naukovy State Farms.

The UESU allegations are not implicated in this argument. Not only did the government at the beginning of its argument state that it would not be referring to the UESU counts, the government followed up its statement that Lazarenko did not have any legitimate business by linking that reference to the claim that the income from Kiritchenko and Naukovy was illegal.

At most, the government indirectly suggested that the UESU business was illegitimate. Lazarenko responded by arguing that "the suggestion that money from UESU or Itera or UEIL and Nakosta had an unlawful source is now no longer before you. Those sources are not unlawful."

The government did not make a contemporaneous objection, but argued to the court during a break that this statement was inappropriate. The court ruled that counsel could argue using the terms of the jury instructions that certain evidence was "not before" the jury, and stated that "there is more than enough in this record to argue the schemes are not proven based on the weight of the record itself, and that's where the argument ought to be." This ruling did not prevent Lazarenko from dispelling any impression, however faint, that may have been left with the jury that all of Lazarenko's wealth was obtained illegally. Understandably, the district court required that the argument, however, would have to be based on the evidence.

The counts we have dismissed fall of their own weight and those we have affirmed stand on their own. The district court did not abuse its discretion in denying the motion for a new trial based on retroactive misjoinder, nor did the court improperly limit Lazarenko's closing argument.

We affirm Lazarenko's convictions on count 1 for conspiracy, counts 2 through 5 for money laundering, and counts 6 through 8 for money laundering. We reverse Lazarenko's convictions on counts 25 through 29 for wire fraud, and count 31 for interstate transportation of stolen property. Because we reverse on six of the fourteen counts of which Lazarenko was convicted, we vacate the sentence and remand for resentencing on the remaining eight counts as to which we affirm the conviction.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**